**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-02545-NYW

STEPHEN HAMER,

      Plaintiff,

v.

CITY OF TRINIDAD,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the following motions:

(1)      Defendant City of Trinidad's ("Defendant" or "City") Renewed Motion for Summary Judgment, filed July 19, 2019, [#82];

(2)      Defendant's Motion to Strike Plaintiff's Affidavits in Response to Summary Judgment (the "Motion to Strike"), filed August 9, 2019, [#92];

(3)      Plaintiff Stephen Hamer's ("Plaintiff" or "Mr. Hamer") Motion to Supplement Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Motion to Supplement"), filed November 19, 2019, [#100]; and

(4)      Defendant's Motion for Leave to Supplement Summary Judgment Briefing and Motion to Strike Briefing ("Defendant's Motion to Supplement"), filed November 21, 2019, [#102].

The undersigned considers the Motions pursuant to 28 U.S.C. § 636(c) and the Order of Reference for all purposes dated November 28, 2016, [#14], and concludes oral argument will not materially assist in the resolution of these matters. Upon careful review of the Motions and associated

briefing, the applicable case law, and the entire record, the court **DENIES** the Renewed Motion for Summary Judgment; **DENIES** the Motion to Strike; and **GRANTS** Plaintiff's Motion to Supplement and Defendant's Motion to Supplement.[1]

## PROCEDURAL BACKGROUND

On October 12, 2016, Plaintiff initiated this action by filing his Complaint, alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 *et seq.* [#1]. Mr. Hamer alleges the City has "discriminated against and subjected [him] to unlawful or hazardous conditions due to the absence of accessible curb ramps within the City's pedestrian right of way." [*Id.* at ¶ 1]; *see also* [*id.* at ¶ 18].

The case proceeded through discovery and the Parties timely filed cross-Motions for Summary Judgment on July 3 and 5, 2017, respectively. [#41; #43]. On October 5, 2017, the undersigned held oral argument and took the Motions under advisement. [#65]. Then, on December 1, 2017, the undersigned issued a Memorandum Opinion and Order granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment. *See* [#67]. The court held that, assuming sidewalks and curb cuts (collectively, "sidewalks") constituted services under the ADA and RA, Mr. Hamer failed to prove that he encountered any noncompliant sidewalk within the two years preceding suit, i.e., on or after

---

[1] Because I find the supplemental materials at least relevant to the issues before the court, I grant the Parties' Motions to Supplement without further discussion. *See Johnson v. Saffle*, 203 F.3d 835 (Table), 2000 WL 130726, at *2 (10th Cir. Feb. 4, 2000) ("We review the court's ruling on the motion to supplement the record for abuse of discretion); *accord Lighton v. Univ. of Utah*, 209 F.3d 1213, 1227 (10th Cir. 2000) ("[T]he district court clearly has discretion to permit supplemental affidavits it finds useful for summary judgment determination."). In doing so, the court grants the respective Motions to Supplement for the sake of completeness to ensure proper consideration of the issues presented, but addresses admissibility separately where appropriate.

October 12, 2014. *See* [*id.* at 15-28]. The court entered final judgment in favor of the City and against Mr. Hamer on December 1, 2017. *See* [#68].

Mr. Hamer filed a timely Notice of Appeal to the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") on December 20, 2017. *See* [#69]. Following oral argument, the Tenth Circuit reversed and remanded the matter back to this court. The Tenth Circuit held,

> a public entity violates Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act each day that it fails to remedy a noncompliant service, program, or activity. As a result, the applicable statute of limitations does not operate in its usual capacity as a firm bar to an untimely lawsuit. Instead, it constrains a plaintiff's right to relief to injuries sustained during the limitations period counting backwards from the day he or she files the lawsuit and injuries sustained while the lawsuit is pending. Because the district court applied a different and incorrect standard, we reverse and remand for further proceedings.

*Hamer v. City of Trinidad*, 924 F.3d 1093, 1097 (10th Cir. 2019). The Tenth Circuit's Mandate issued on June 20, 2019, at which point this court resumed jurisdiction over the matter. *See* [#77].

Following remand, the court held a Status Conference with the Parties to discuss a supplemental Scheduling Conference, at which the court set a deadline for Defendant to file its Renewed Motion for Summary Judgment given the court's earlier ruling did not substantively address the issue of whether sidewalks constitute services, programs, or activities under the ADA and RA or whether Defendant had adequately established its affirmative defense of undue burden. *See* [#80]. The court later converted the supplemental Scheduling Conference to a Status Conference given Defendant's filing of a Motion to Stay these proceedings pending its forthcoming petition for writ of certiorari with the Supreme Court of the United States. *See* [#84; #88]. The court denied the City's Motion to Stay and set a supplemental discovery schedule that was set to close on November 29, 2019, but later extended to December 30, 2019 at the request of the Parties. *See* [#94; #99]. The Supreme Court has since denied the City's Petition for Writ of Certiorari. [#107].

Presently before the court are two motions.[2]  First, the City has moved for summary judgment in its favor, because sidewalks are not a service, program, or activity under the ADA or RA, ordering the City to make all its sidewalks ADA and RA compliant constitutes an undue burden, and/or the statute of limitations, even under the repeated violations doctrine articulated by the Tenth Circuit, bars Plaintiff's claims.  *See* [#82].[3]  Second, the City has moved to strike the affidavits Plaintiff proffers in support of his Response to the Renewed Motion for Summary Judgment, because they constitute "sham" affidavits.  *See* [#92].  Because the Motions are ripe for disposition, I consider them below.

## LEGAL STANDARD

Pursuant to Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625

---

[2] On January 6, 2020, the City filed its Rule 702 Motion to Strike or Exclude Certain Portions of Mr. Heybeck's Supplemental Expert Report, *see* [#109], which I will address by separate Order.

[3] As part of his Response to the Renewed Motion for Summary Judgment, Plaintiff requests additional discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.  [#89 at 3-5]. But this District's Local Rules of Civil Practice prohibit the inclusion of a motion within a response. *See* D.C.COLO.LCivR 7.1(d).  Further, the court has since re-opened discovery on a limited basis, *see* [#94], and Mr. Hamer has not moved for leave to file an additional dispositive motion or to supplement his Response further.  Thus, I **STRIKE** this portion of Plaintiff's Response and the Affidavit of Mr. Hamer's counsel Garrett DeReus [#89-1].  For this reason, I also **DENY as moot** the City's Motion to Strike [#92] as to Mr. DeReus's Affidavit.

F.3d 1279, 1283 (10th Cir. 2010). And this is so when, as here, a defendant moves for summary judgment to test an affirmative defense—the defendant must demonstrate the absence of any disputed fact as to the affirmative defense asserted. *See Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011); *accord Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (explaining that the nonmovant must then "demonstrate with specificity the existence of a disputed fact" as to the defendant's affirmative defense). At all times, the court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

Should the City be able to satisfy its burden and establish all elements of its affirmative defense, Mr. Hamer must then point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998) (explaining that the nonmovant cannot rely on "mere reargument of his case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a <u>form</u> that is admissible at trial, only the <u>substance</u> must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

**MATERIAL FACTS**

The court draws the following material facts from the record before it. These facts are undisputed unless otherwise noted.

1.      Mr. Hamer, a resident of the City of Trinidad, Colorado, is confined to a motorized wheelchair and is a qualified individual with a disability under the ADA, *see* [#41-1 at 161:1-4, 162:8-12, 163:23-25, 167:1-9]; he does not drive or utilize public transportation and his "primary means of public transportation" are the City's public sidewalks, *see* [#41-6 at ¶ 2].

2.      The City has approximately "154 miles of sidewalk and approximately 1300 curb cuts," [#82-6 at ¶ 5]; the City's Municipal Code sets forth the required widths, grade, and slope of any constructed sidewalk, and requires a permit from the City Engineer before construction may begin, *see* [#41-15 at 14-15].

3.      Mr. Hamer alleges the City's noncompliant sidewalks violate Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulations 28 C.F.R. §§ 35.150, 35.151, 35.133, as well as § 504 of the RA, 29 U.S.C. § 794(a), *see generally* [#1; #51 at 206:4-7; #82-1 at 2-3; #82-2 at 2].

4.      Beginning in April 2014, Mr. Hamer attended City Council meetings and lodged complaints about the City's noncompliant sidewalks. [#43-1 at 9-14].

5.      On or about April 29, 2014, Plaintiff filed an ADA complaint with the United States Department of Justice ("DOJ"), alleging the City's sidewalks were noncompliant with ADA regulations, among other things, *see* [#43-1 at 17-19], which led to an ADA audit of the City, *see* [#41-2 at 21:4-7, 23:2-25, #41-3 at 59:5-60:14; #41-16].

6.      Despite not recalling exactly when and which barriers he encountered during his deposition in April 2017, *see* [#82-3 at 237:13-238:13], Mr. Hamer attests that he encounters

6

barriers daily in the City and did so between October 12, 2014 and October 12, 2016 and as late as July 22, 2019, *see* [#89-2 at ¶¶ 2-7];[4] these include but are not limited to:

    a.   The intersection of Raton Street and First Street;

    b.   The intersection of Santa Fe Trail and West First Street;

    c.   The eastern sidewalk of Santa Fe Trail;

    d.   The intersection of West Main Street and Santa Fe Trail;

    e.   The absence of curb cuts on West Main Street;

    f.   The West Main Street sidewalk between Animas Street and Convent Street;

    g.   The sidewalk in front of Bella Luna Pizzeria;

    h.   The absence of a curb cut at East Main Street and Maple Street;

    i.   The absence of a curb cut at Main Street and Chestnut Street;

---

[4] The City requests that the court strike Mr. Hamer's Affidavit [#89-2] attached to his Response to the Renewed Motion for Summary Judgment, because it contradicts Plaintiff's prior sworn testimony and is therefore a "sham" affidavit. *See* [#92]. Courts may disregard an otherwise proper affidavit if the court first determines that the affidavit's purpose is to create a sham issue of material fact, but there is no authority to disregard the affidavit simply because it contradicts an affiant's prior sworn testimony. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014). Although the court initially rejected Mr. Hamer's reliance on the continued noncompliance of the City's sidewalks to satisfy the statute of limitations without identifying when within the two years preceding suit he encountered these barriers, the Tenth Circuit has since articulated the contours of the applicable statute of limitations and remanded to this court to "determine which of the City's sidewalks and curb cuts Plaintiff has actually been deterred from utilizing." *Hamer*, 924 F.3d at 1110–11. His Affidavit does just that—it provides more context to when he encountered the barriers testified to within the two years preceding suit and since he filed suit. *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (explaining that an affidavit was not a sham where it provided more examples of the racial hostility the plaintiff experienced but which she did not fully testify to in her deposition). This is not a situation where Mr. Hamer first testified that he never again encountered certain barriers within the two years preceding suit and then submitted an affidavit to the contrary. Rather, during his deposition on April 27, 2017, Mr. Hamer testified under oath that he had experienced difficulty with each and every sidewalk marked as noncompliant on Mr. Heybeck's report. [#92-2 at 237:7-12]. The fact that Mr. Hamer could not then identify the specific date which he visited each intersection or provide corroborating documentation does not render his subsequent Affidavit a sham. At bottom, the City attacks Mr. Hamer's credibility, but this is an improper basis to strike his Affidavit. Thus, I **DENY** the Motion to Strike [#92] as to Mr. Hamer's Affidavit.

j.   The sidewalk on Chestnut Street between Main Street and East First Street;

k.   The absence of a curb cut at Chestnut Street and East First Street;

l.   The absence of curb cuts at the intersection of Maple Street and First Street;

m.   The intersection of Plum Street and Commercial Street;

n.   The absence of curb cuts on Arizona Avenue; and

o.   The absence of curb cuts at the intersection of Second Street and High Street.

*See* [#41-7 at 1-5; #82-1 at 2; #89-2 at ¶¶ 2-7; #92-1 at 4 (indicating Mr. Hamer encountered barriers on February 9, 2017)].

7.     Upon inspection of approximately 178 curb ramps and 55 sidewalks in "high use" areas, Plaintiff's engineering expert Nicholas Heybeck ("Mr. Heybeck") opined that approximately 67% of the surveyed curb ramps were noncompliant with ADA standards, *see* [#41-8 at 13; #82-4], and Mr. Hamer testified under oath that he regularly encounters the barriers Mr. Heybeck identified, *see, e.g.*, [#41-7 at 1-5; #82-3 at 237:7-23].

8.     Initially, the City sought to pledge between $500,000 and $1 million for the 2017 City budget to remediate its sidewalks in anticipation of a consent decree (or other similar agreement) with the DOJ, [#82-5 at 35:8-23], and set aside $600,000 to ameliorate ADA compliance issues noted by the DOJ, *see* [#82-6 at ¶ 7].

9.     According to the City's engineering expert Mike Kibbee, it would cost the City $913,618.74 to repair and/or renovate twenty-one (21) "intersections in the downtown area," *see* [#82-6 at ¶ 4; #82-7], and the City estimates it would cost over $10 million for complete compliance throughout the City, which would divert funds from other City programs and necessities, *see* [#82-6 at ¶¶ 6, 10].

10.     In or around mid-2018, the City hired Meeting the Challenge as an ADA consultant to inspect the City's sidewalks, *see* [#100-1; #100-5 at 5:3-17]; according to Meeting the Challenge's survey, 78% of the 2,059 inspected "elements" (i.e., "either an intersection, a corner, or a sidewalk," [#100-5 at 7:21-8:5]) were noncompliant with the ADA, *see* [#100-5 at 9:2-21].

11.     In response to the Meeting the Challenge Survey, the City developed a Phase 1 and Phase 2 plan to address the top priority (i.e., most used) elements, and have since remedied the 38 noncompliant elements identified in Phase 1, including the curb cut on Commercial Street south of the Purgatoire River Bridge.  *See* [#49-1 at 150:9-23; #82-8 at ¶ 3; #102-1 at 38:16-19, 39:24-40:21, 41:4-10, 47:2-9, 54:1-3 (suggesting the City has removed barriers on First Street, Raton Street, Santa Fe Trail, and Main Street, and that Mr. Hamer has an accessible route to the post office along Main Street); #100-5 at 25:23-26:4 (same)].

12.     Phase 2 has yet to commence, but the City has begun remedying several elements along Church Street and has budgeted roughly $1.5 million for ADA repairs in 2020.  *See* [#100-5 at 35:12-36:2, 38:3-23, 39:4-12].

13.     To date, it appears that roughly 76% of the elements Meeting the Challenge identified remain noncompliant.  *See* [#100-1; #100-5 at 6:7-9, 12:20-23, 13:11-25, 14:5-15:3].

## ANALYSIS

By enacting the ADA and RA Congress sought to ensure disabled individuals received full and equal opportunities to participate in society by prohibiting discrimination based on an individual's disability.  *See* 42 U.S.C. §§ 12101(a)-(b); 29 U.S.C. § 701(a)-(b).  The ADA prohibits discrimination in three realms of public life: employment (Title I); public services, programs, or activities (Title II); and places of public accommodation (Title III).  *See Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).  Likewise, § 504 of the RA prohibits exclusion of a disabled individual

from "any program or activity receiving Federal financial assistance" because of that individual's disability. 29 U.S.C. § 794(a). To remedy alleged discrimination, both statutes allow private citizens to sue for damages for alleged statutory violations. *See Guttman v. Khalsa*, 669 F.3d 1101, 1109 (10th Cir. 2012) (citing 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794(a))).

The City moves for summary judgment for three reasons. First, the City argues its sidewalks do not constitute a service, program, or activity under the ADA or RA, and thus neither statute provides Mr. Hamer an avenue of relief for the alleged discrimination. Second, the City argues that should the court conclude that sidewalks are a service, program, or activity, requiring the City to bring all sidewalks into ADA and RA compliance constitutes an undue burden. Third and finally, the City argues the statute of limitations, even under the repeated violations doctrine, bars Mr. Hamer's claims. Because the ADA and RA "involve the same substantive standards, [courts] analyze them together." *Miller ex rel. S.M. v. Bd. of Educ. Of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1245 (10th Cir. 2009) (citation omitted). Accordingly, the court's analysis of these issues largely focuses on the ADA, but this analysis applies equally to the RA. *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1102 (10th Cir. 1999) ("Because the language of disability used in the ADA mirrors that in the Rehabilitation Act, we look to cases construing the Rehabilitation Act for guidance when faced with an ADA challenge."); *cf. Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (explaining that Congress directed courts to "construe the ADA to grant at least as much protection as provided by the regulations implementing the [RA].").

## I. Whether Sidewalks Constitute a Service, Program, or Activity

Mr. Hamer's claims arise under Part A of Title II, which commands, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a) (prohibiting exclusion from "any program or activity receiving Federal financial assistance."). Title II thus contains two primary prohibitions: (1) exclusion from "services, programs, or activities of a public entity" and (2) discrimination by the public entity. *See Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1306 (10th Cir. 2012).

Title II directs the DOJ, through the Attorney General, to promulgate regulations that implement Part A "consistent with" the regulations implementing § 504 of the RA. *See* 42 U.S.C. § 12134(a)-(b). The DOJ's regulations provide that Title II's prohibition on the exclusion of disabled individuals from a public entity's services, programs, or activities "applies to <u>all</u> services, programs, and activities <u>provided</u> or <u>made available</u> by public entities[,]" 28 C.F.R. § 35.102(a) (emphasis added), which the DOJ in turn interprets as extending to "<u>anything a public entity does</u>[,]" 28 C.F.R., Ch. 1, Pt. 35, app. B (emphasis added). Indeed, "courts broadly construe Title II as covering a variety of community services and programs." *Reeves v. Queen City Transp.*, 10 F. Supp. 2d 1181, 1183 (D. Colo. 1998) (collecting cases); *accord Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172 (9th Cir. 2002) ("Courts must construe the language of the ADA broadly in order to effectively implement the ADA's fundamental purpose").[5] "Title II therefore imposes 'an affirmative obligation [on public entities] to accommodate persons with disabilities.'" *Hamer*, 924 F.3d at 1104-05 (quoting *Lane*, 541 U.S. at 533).

---

[5] For instance, courts have extended Title II to state prisons, *see Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998); zoning decisions, *see Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999); foster care, *see Eric L. By and Through Schierberl v. Bird*, 848 F. Supp. 303, 313-14 (D.N.H. 1994); open burning regulations, *see Heather K. by Anita K. v. City of Mallard, Iowa*, 946 F. Supp. 1373, 1384-87 (N.D. Iowa 1996); quarantine measures, *see Crowder v. Kitagawa*, 81 F.3d 1480, 1483-85 (9th Cir. 1996); public contracting, *see Johnson v. City of Saline*, 151 F.3d 564, 569-70 (6th Cir. 1998); streets, roadways, and highways, *see Young v. City of Claremore*, Okla., 411 F. Supp. 2d 1295, 1304 (N.D. Okla. 2005); and the installation and maintenance of crossing signals at crosswalks, *see Scharff v. Cty. of Nassau*, No. 10 CV 4208 DRH AKT, 2014 WL 2454639, at *7 (E.D.N.Y. June 2, 2014).

The City contends that its sidewalks are not "services, programs, or activities," and thus Title II does not provide Mr. Hamer his requested relief and his claim fails as a matter of law. The City contends that the court cannot simply defer to the DOJ's interpretation of "services, programs, or activities" as encompassing "anything a public entity does," but rather must undertake a comprehensive analysis of the statutory text of Title II and the DOJ's implementing regulations. According to the City, the Supreme Court of the United States' recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019),[6] cabins the amount of deference a court may bestow to an agency's interpretation of its own ambiguous regulations and now necessitates a "hair-splitting" analysis leading to a conclusion that sidewalks are not "services, programs, or activities."

Respectfully, the City's argument misses the mark. First, it presumes that prior courts reflexively deferred to the DOJ's interpretation of "anything a public entity does" in concluding that a public entity's sidewalks constitute a service, program, or activity, without ample consideration of the text, structure, and history of the ADA itself. [#67 at 14 n.5]. Second, and most importantly, for the reasons set forth below, the court concludes that the statutory interpretation of "services" unambiguously leads to the conclusion that sidewalks are "services" covered by the ADA, without having to defer to any interpretation of DOJ regulations.

## A.    Principles of Statutory Interpretation

In interpreting Title II, the court's "primary task" is to decipher "congressional intent, using traditional tools of statutory interpretation." *Izzo v. Wiley*, 620 F.3d 1257, 1260 (10th Cir. 2010)

---

[6] There the Supreme Court was asked to revisit the continued viability of its holdings in *Auer v. Robbins*, 519 U.S. 452 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), which established the principle that courts may and/or should defer to an agency's reasonable interpretation of its own genuinely ambiguous regulations—otherwise known as *Auer* deference or *Seminole Rock* deference. *Kisor*, 139 S. Ct. at 2408. A five Justice majority of the Court held that *stare decisis* counseled against overruling *Auer* and *Seminole Rock*, and in doing so "t[ook] the opportunity to restate, and somewhat expand on, those principles . . . to clear up some mixed messages [the Court] ha[d] sent." *Id.* at 2414, 2422-23.

(internal quotation marks omitted). The court's starting point is the plain language of Title II, and the court presumes Congress correctly expresses its intent "in the ordinary meaning of the words it employs." *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1245 (10th Cir. 2008) (internal quotation marks omitted). The court may also look to Title II's structure and context, *see In re Mallo*, 774 F.3d 1313, 1317 (10th Cir. 2014), as well as its purpose, history, and relationship to other statutes, *see New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1223-24 (10th Cir. 2017), when interpreting its statutory text. "If the terms of the statute are clear and unambiguous, they are controlling absent rare and exceptional circumstances." *S. Ute Indian Tribe v. Sebelius*, 657 F.3d 1071, 1078 (10th Cir. 2011) (internal quotation marks omitted).

Should true ambiguity exist the court may then defer to an executive agency's interpretation of that ambiguity if Congress delegated authority to that executive agency to promulgate regulations enforcing the ambiguous statute. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984); *see also Am. Fed'n of Gov't Employees, Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016) (explaining that before *Chevron* deference applies a court must first determine that the statute is ambiguous; stating, "Even a statutory provision whose words might have multiple meanings is not necessarily ambiguous. Ambiguity is a creature not of definitional possibilities but of statutory context." (internal quotation marks omitted)). If Congress has spoken to the precise question at issue, the court must give effect to the express intent of Congress. *Keller Tank Servs. II, Inc. v. Comm'r of Internal Revenue*, 854 F.3d 1178, 1196 (10th Cir. 2017). If, however, Congress has not spoken on the precise issue, the court must determine whether the agency's interpretation of that ambiguity is permissible. *See Sinclair Wyoming Refinery Co. v. United States Envtl. Prot. Agency*, 887 F.3d 986, 990 (10th Cir. 2017).

As to regulations implementing a statute, a court may, in some instances, defer to the agency's reasonable interpretation of its own regulation. *See Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1062 (10th Cir. 2014) (discussing *Auer* deference). But the Supreme Court reiterated that such deference applies <u>only if</u> the court determines the agency's regulation is "genuinely ambiguous," the agency's interpretation "fall[s] within the bounds of reasonable interpretation," and the agency's interpretation reflects its "authoritative, expertise-based, fair, or considered judgment." *Kisor*, 139 S. Ct. at 2414-18 (brackets and internal quotation marks omitted). If the regulation is not genuinely ambiguous, *Auer* and *Seminole Rock* deference do not apply, and courts should give the regulation its plain and ordinary meaning. *Id.* at 2415.

**B. Application to Sidewalks Under Title II of the ADA**

**1. Statutory Text**

Title II does not define "services, programs, or activities." *See* 42 U.S.C. § 12131 (defining only "public entity" and "qualified individual with a disability"); *but cf.* 29 U.S.C. § 794(b)(1)(A) (defining "program or activity" as "all of the operations of a department, agency, special purpose district, or other instrumentality of a . . . local government"). "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In many instances, the court may begin with dictionary definitions when discerning the ordinary meaning of an undefined term. *See United States v. Brune*, 767 F.3d 1009, 1022 (10th Cir. 2014).

The dictionary definition of "service" includes: "the condition or occupation of a servant"; "an act done for the benefit or at the command of another"; or "action or use that furthers some end or purpose [or] conduct or performance that assists or benefits someone or something." *Webster's Third New International Dictionary* 2075 (2002); *see also* 15 *Oxford English Dictionary*

36 (2d ed. 1998) (defining "service" to include "the action of serving, helping, or benefiting; conduct tending to the welfare or advantage of another."); *Elwell*, 693 F.3d at 1306 (same).[7]  A sidewalk is "[a] (raised) path for foot-passengers along the side of a street, road, etc," 15 *Oxford*, *supra*, at 433, or "a walk for foot passengers [usually] at the side of a street or roadway," *Webster's*, *supra*, at 2113.

There can be no real dispute that sidewalks (as well as their construction, alteration, and maintenance) are provided by local governments for the benefit of its residents and others so that they may move freely within its boundaries.  *Cf. Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (agreeing that the State of Florida "has a strong interest . . . in promoting the free flow of traffic on public streets and sidewalks").  Indeed, the City's Municipal Code sets forth explicit parameters for its sidewalks, requires City approval before construction may begin, and permits the City to order the construction of a new sidewalk if deemed necessary.  *See* [#41-15 at 14-16].  In a different context, the Supreme Court implicitly recognized that sidewalks—like ordinary police and fire protection, connections for sewage disposal, and public highways—are "general government services."  *See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 17 (1947). This suggests that a sidewalk, as well as its construction, maintenance, and alteration, constitutes a service as that term is ordinarily understood.  The fact that a sidewalk is also an accessway to a local government's services—like police protection and the courthouse—does not necessarily preclude a finding that a sidewalk itself constitutes a "service" based on its plain meaning.

---

[7] In *Elwell*, the Tenth Circuit considered whether a plaintiff could allege an employment discrimination claim under Title I and Title II of the ADA.  The Tenth Circuit held that the statutory text of Title I and Title II made clear that such actions could arise only under Title I.  In so concluding, the Tenth Circuit rejected the notion that the term "activity" at the end of "services, programs, or activities" under 42 U.S.C. § 12132 was a catch-all for anything a public entity does; instead it captured "all the outputs the public entity provides to the public it serves[.]"  *See Elwell*, 693 F.3d at 1307.  Under this definition, the City's sidewalks would certainly be an output (i.e., something produced) provided to the public it serves.

## 2.    Structure, Purpose, and Legislative History of the ADA

As observed by the Tenth Circuit on appeal in this matter, "the meaning of statutory language, plain or not, depends upon not only the terminology itself but also its context. *See Hamer*, 924 F.3d at 1103 (internal quotation marks omitted) (citing *First Nat'l Bank of Durango v. Woods* (*In re Woods*), 743 F.3d 689, 694 (10th Cir. 2014) (quoting *United States v. Villa*, 589 F.3d 1334, 1343 (10th Cir. 2009)); *see also* [#75 at 16].   This court therefore looks to the specific context in which the language is used, before considering the broader context of the statute as a whole. *Hamer*, 924 F.3d at 1103; [#75 at 16].   After doing so, I find the structure, purpose, and legislative history of the ADA further support a conclusion that the plain meaning of "service" must be construed to include the City's sidewalks.

With the ADA, "Congress's express statutory purpose" was to assure full participation for individuals with disabilities. *See Hamer*, 924 F.3d at 1106; [#75 at 21].   Congress structured the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), with different titles to address the historical isolation and segregation of individuals with disabilities in "critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services," *id.* § 12101(a)(1)-(3). Those titles include: Title I, which addresses discrimination in employment, *id.* §§ 12111-12149; Title II, which addresses discrimination in public services, *id.* §§ 12131-12165; Title III, which addresses discrimination in public accommodations and services operated by private entities, *id.* §§ 12181-12189; and Title IV now includes miscellaneous provisions, including expressly setting

forth the ADA's relationship with the RA, *id.* §§ 12201-12213.[8] *See also* H.R. REP. 101-485, 23-24, *as reprinted in* 1990 U.S.C.C.A.N. 303, 304-306.

In addressing public services under Title II, Congress defined public entities as "any State or local government," 42 U.S.C. § 12131(1)(A), and defined a "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, and practices, the removal of <u>architectural</u> . . . or <u>transportation</u> <u>barriers</u> . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2) (emphasis added). This definition underscores Congress's concerns with architectural and transportation barriers prohibiting a disabled individual's participation in a public entity's "services, programs, or activities." It therefore expands Title II's prohibition on discrimination—it does not narrow it. And contrary to the City's argument, the reference to the removal of architectural or transportation barriers does not establish that sidewalks are facilities instead of services. Rather, because a sidewalk is a service, the definition of a qualified individual with a disability necessarily mandates that the City remove any architectural or transportation barriers that prohibit a qualified individual, like Mr. Hamer, from utilizing that <u>service</u>. *See Frame v. City of Arlington*, 657 F.3d 215, 229 (5th Cir. 2011) (explaining that a transportation barrier might be a ditch and thus a local government would be required to remove the ditch if it prohibited a qualified individual from accessing/utilizing a sidewalk).

Further, Title II repeatedly refers to mobility issues. And although the specific examples focused upon public transportation as provided by public transit authorities, it would be illogical to read Part A of Title II as excluding the City's sidewalks from "services," especially when those

---

[8] As originally promulgated, Title IV addressed telecommuncations relay services for hearing impaired and speech impaired individuals. *See* H.R. REP. 101-485, 24, *as reprinted in* 1990 U.S.C.C.A.N. 303, 305. Now, that area is addressed in 47 U.S.C. §§ 225, 611.

sidewalks facilitate individual mobility (and indeed, perhaps independent mobility) throughout a municipality. Title II's discussion of accessibility in other contexts, such as bus and rail services in Part B, make clear that Congress intended the ADA to facilitate disabled individual's mobility, "including individuals who use wheelchairs," to achieve full and equal participation in society and to eliminate a pervasive form of discrimination. *See, e.g.*, 42 U.S.C. §§ 12101(a)(5), 12142(a). Equally clear is Congress's intent to afford disabled individuals a comparable level of service provided to individuals without disabilities. *See, e.g.*, *id.* § 12143(a). It would be inconsistent with clear congressional intent to then exclude from Part A of Title II sidewalks that facilitate movement, especially when nothing suggests such a carve-out from Title II.

The ADA's legislative history also supports interpreting "services" to include sidewalks. As discussed above, Congress expressly stated it intended the ADA to be "comprehensive" in its coverage, and described Title II as "a general prohibition against discrimination" that "extends the anti-discrimination prohibition embodied in [§] 504 [of the RA] to <u>all actions</u> of state and local governments." H.R. REP. 101-485, 23, 84, *as reprinted in* 1990 U.S.C.C.A.N. 303, 304, 367 (emphasis added). Congress also intended the ADA to promote the ability for disabled individuals to be self-reliant and self-sufficient. H.R. REP. 101-485, 37, *as reprinted in* 1990 U.S.C.C.A.N. 303, 319. Indeed, a "critical goal of [the] legislation [is] to allow individuals with disabilities to be part of the economic mainstream of our society." H.R. REP. 101-485, 34, *as reprinted in* 1990 U.S.C.C.A.N. 303, 316. To that end, the legislative history expressly indicates that under Title II, "<u>local and state governments are required to provide curb cuts on public streets</u>. The employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." H.R. REP. 101-485, 84, *as reprinted in* 1990 U.S.C.C.A.N. 303, 367 (emphasis added). By logical

extension, Congress's stated purpose of eliminating pervasive discrimination in the public sector would be undercut if people with disabilities—whether mobility, sight, or other disabling impairments—could not travel on sidewalks safely and effectively between those curb cuts.

### 3. Broader Statutory Context and Relationship With the RA

Finally, the broader statutory context of the ADA and its relationship with the RA supports the conclusion that "services" include sidewalks. The legislative history indicates:

> Title II of the legislation has two purposes. The first purpose is to make applicable the prohibition against discrimination on the basis of disability, currently set out in regulations implementing section 504 of the Rehabilitation Act of 1973, to all programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto, regardless of whether or not such entities receive Federal financial assistance. Currently, section 504 prohibits discrimination only by recipients of Federal financial assistance.
>
> The second purpose is to clarify the requirements of section 504 for public transportation entities that receive Federal aid, and to extend coverage to all public entities that provide public transportation, whether or not such entities receive Federal aid.

H.R. REP. 101-485, 84, 1990 U.S.C.C.A.N. 303, 366. Therefore, Congress specifically intended, at the least, for courts to construe the ADA coextensive to the RA. *See Bragdon*, 524 U.S. at 632. The RA defines "program or activity" as "all operations of . . . a local government." 29 U.S.C. § 794(b)(1)(A). For these reasons, this court concludes that the plain meaning of Part A of Title II unambiguously includes sidewalks under its purview, whether as a "service" or a "program or activity" consistent with the RA.

### 4. Other Persuasive Authority

This court is not alone in concluding that the plain language of Title II clearly and unambiguously includes sidewalks. A split en banc panel of the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") reached a similar conclusion. In *Frame v. City of Arlington*, the Fifth Circuit considered whether "Title II and § 504 [of the RA] (and their implied right of

action) extend to newly built and altered public sidewalks." 657 F.3d at 221 (footnote omitted).

Like Mr. Hamer, the *Frame* plaintiffs utilized motorized wheelchairs for mobility and alleged that "certain inaccessible sidewalks make it dangerous, difficult, or impossible for them to travel to a variety of public and private establishments throughout [Arlington]." *Id.* Regardless of whether the sidewalk itself constituted a service or whether the building and altering of a sidewalk constituted a service, the Fifth Circuit held that "[b]ased on statutory text and structure . . . Title II and § 504 <u>unambiguously</u> extend to newly built and altered public sidewalks." *Id.* at 223, 226 (emphasis added).

Contrary to the City's arguments, *see* [#82 at 7-9], the majority in *Frame* did not blindly follow the DOJ's interpretation of services, programs, or activities as "anything a public entity does." Rather, the *Frame* court began by acknowledging that the ADA is "a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended to 'eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame*, 657 F.3d at 223 (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)). It then considered Title II's plain language and the "language and design of the statute as a whole" to ascertain its plain meaning. *Id.* at 224 (internal quotation marks and footnotes omitted); *see also id.* at 225 (explaining, "[t]hat a statute may be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotation marks omitted)).

The *Frame* court began by defining "service" to mean "the performance of work commanded or paid for by another"; "an act done for the benefit or at the command of another"; "the provision, organization, or apparatus for . . . meeting a general demand"; "the duties, work, or business performed or discharged by a public official"; and defined "public service" to mean

"work provided or facilitated by the government for the general public's convenience and benefit."
*See id.* at 226-27 (brackets and internal quotation marks omitted).  Under these definitions, the
Fifth Circuit first concluded that the building and altering of sidewalks unambiguously constitute
a "service," because it was work commanded by voters and/or public officials, paid for by
taxpayers, and done for the benefit of pedestrians and drivers.  *See id.* at 226.  It also determined
that the building and altering of sidewalks clearly fell within the RA's definition of "program or
activity," which included "all of the operations" of a local government.  *See id.*  at 227.  Finally,
the *Frame* court held that a sidewalk <u>itself</u> was "unambiguously a service, program, or activity,"
because it "facilitates the 'public's convenience and benefit by affording a means of safe
transportation" and is the "'apparatus' that meets the public's general demand for safe
transportation."  *Id.* at 226-228; *see also id.* at 228-31 (considering the structure and context of
Title II, its relationship to the RA, and its history and purpose of combating isolation and
segregation of qualified individuals—all of which suggested that Title II clearly covered a city's
sidewalks).

The City urges this court to align with the *Frame* dissent and conclude that sidewalks are
facilities, not services, but this court is not persuaded.  Like the dissent, the City relies on a
constrained reading of the definition of "qualified individual with a disability" in defining
"service," rather than focus on the plain and ordinary meaning of "service."  *See* [#82 at 10; #91
at 4-5].  According to the City, the definition of qualified individual with a disability renders a
sidewalk an architectural or transportation barrier that may prohibit a qualified individual from
accessing a local government's services.  *See* [#82 at 10; #91 at 5].  Thus, the City argues, a
sidewalk is better understood as a <u>facility</u> because it is a form of transportation covered under Part

B of Title II and which acts as a barrier to services, not as a service itself. *See* [#82 at 11-13; #91 at 5-6].

For the reasons stated above, this court concludes that a sidewalk is a service as that term is plainly and ordinarily understood from the statutory text, structure, legislative history, and broader statutory context. *See* [#89 at 6-8]. *See also Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 939 (N.D. Ind. 2009) ("The court agrees that the ADA is to be construed broadly, and while the statute may not mandate that the phrase 'services, programs, or activities' encompass, without exception, all things that a public entity does, the ADA is broad enough to include public sidewalks within the scope of a city's services, programs, or activities."). And as the City acknowledges, *see* [#91 at 7], "if the statutory language is clear, [the court's] analysis ordinarily ends." *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014). Moreover, the court finds no absurdity or incongruency in interpreting service to encompass a sidewalk, as this fits well within the ADA's structure and broad purpose to combat systemic discrimination against disabled individuals. *See, e.g.*, *PGA Tour, Inc.*, 532 U.S. at 676 ("To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life"); *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) ("We construe the language of the ADA broadly to advance its remedial purpose. . . . A city sidewalk is therefore a 'service, program, or activity' of a public entity within the meaning of Title II." (internal citations omitted)); *Frame*, 657 F.3d at 231 ("Continuing to build inaccessible sidewalks without adequate justification would unnecessarily aggravate the social costs Congress sought to abate [in enacting Title II]."); *Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002) (holding that the plain language of the RA supported a broad construction of the phrase "services, programs, or activities," because although the ADA does not define those terms, the RA defines "program or activity" as "all of the

operations of" a qualifying local government).  *Cf.* H.R. REP. 101-485, 84, *as reprinted in* 1990

U.S.C.C.A.N. 303, 367 (explaining Congress intended Title II to "extend[] the anti-discrimination

prohibition embodied in section 504 [of the RA] to <u>all</u> actions of state and local governments,"

including the provision of curb cuts because the ADA would be "meaningless if people who use

wheelchairs were not afforded the opportunity to travel on and between the streets.").

*      *      *

In sum, the court need not look to the ADA's implementing regulations or apply any level

of deference to the DOJ's interpretation of those regulations to reach its conclusion.  The statutory

text, as well as its structure, legislative history, and broader statutory context, make clear that

sidewalks are a service, program, or activity, as those terms are plainly and ordinarily understood.

Accordingly, I **DENY** the Renewed Motion for Summary Judgment in this regard.

## II.      Whether Mr. Hamer's Requested Relief Constitutes an Undue Burden

"Title II imposes an affirmative obligation on public entities to make their programs

accessible to qualified individuals with disabilities, except where compliance would result in a

fundamental alteration of services or impose an undue burden."  *Toledo v. Sanchez*, 454 F.3d 24,

32 (1st Cir. 2006); *see also* 28 C.F.R. § 35.150(a)(3).  "The public entity has the burden to prove

that a proposed action would result in undue burden or fundamental alteration[.]"  *K.M. ex rel.*

*Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013); *see also* 28 C.F.R.

§ 35.150(a)(3) ("a public entity has the burden of proving that compliance with § 35.150(a) of this

part would result in such alteration or burdens.").  "If, however, there is no factual basis in the

record demonstrating that accommodating the individual would require a fundamental

modification or undue burden, then a public entity's failure to reasonably accommodate an

individual's disability violates the ADA."  *Soto v. City of Newark*, 72 F. Supp. 2d 489, 496 (D.N.J.

1999) (internal quotation marks omitted). The court's inquiry is therefore necessarily fact-specific. *See Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746, 753 (N.D. Tex. 2010).

To invoke the undue burden defense, the head of the public entity must make this decision "after considering all resources available for use in the funding and operation of the service, program, or activity, and [the decision] must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.150(a)(3). Notwithstanding the undue burden defense, the public entity "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity." *Id.* (emphasis added). The City moves for summary judgment in its favor based on the undue burden defense, contending that Mr. Hamer seeks immediate remediation of all the City's sidewalks and such an "all or nothing demand" constitutes an extreme financial burden. *See* [#82 at 16-18; #91 at 8-10]. As discussed above, the City bears the burden of demonstrating, in the first instance, that the undisputed facts establish all elements of its affirmative defense of undue burden. Based on the record currently before the court, the City has failed to do so, and therefore summary judgment is not warranted as a matter of law.

As an initial matter, the court agrees with Mr. Hamer that the undue burden defense applies only to existing facilities that were built before the ADA's enactment on January 26, 1992. *See* 28 C.F.R. § 35.150(a). Such a defense does not exist for new construction and alterations under 28 C.F.R. § 35.151 or for maintenance of accessible features under 28 C.F.R. § 35.133. Indeed, the undue burden defense applies in only one other instance—the DOJ's regulations regarding communications. *See* 28 C.F.R. § 35.164 ("This subpart does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."). The City, then, may

invoke the defense for only those sidewalks built before January 26, 1992 and subject to 28 C.F.R. § 35.150 under Title II of the ADA. *See Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1094-95 (C.D. Cal. 2013) (holding that the undue burden defense applied only to existing facilities under the ADA and was not available for existing facilities under the RA). But the City has failed to provide any evidence establishing <u>when</u> the various sidewalks at issue were built. Without such information, regardless of whether the City Manager Greg Sund's Declaration complies with the requirements of 28 C.F.R. § 35.150(a)(3), *cf.* [#82-6], or whether the City's cost estimates for complete compliance are unrebutted, *see* [*id.* at ¶¶ 4-10; #82-7], the City has failed to satisfy its burden of establishing all elements of the undue burden defense for any or all sidewalks at issue.

Moreover, to the extent that Defendant contends that it is entitled to prevail on its undue burden defense due to an unreasonable "all or nothing approach," Mr. Hamer disputes that he is seeking immediate remediation of all sidewalks and curb cuts. [#89 at 2 ¶¶ 10-11]. In reviewing the Complaint in this matter, though Plaintiff seeks "preliminary and permanent injunctive relief," nothing in the Complaint, and indeed nothing in the statute, requires that the "readily achievable alterations" sought by Mr. Hamer be made immediately. *See* [#1 at 16]. And this court respectfully disagrees that the circumstances of *Young v. City of Clermore, Okla.*, 411 F. Supp. 2d 1295, 1310 (N.D. Okla. 2005)—in which the plaintiff sought an amendment to state law to allow for unfettered access to operate golf carts on municipal streets—are sufficiently akin to the ones presented here, nor do they merit a finding that the City is entitled to summary judgment based on an undue burden.

Finally, the court notes that there exists a genuine dispute of material fact as to the nature and extent of Mr. Hamer's requested relief and the effort and expense required to meet those demands. The City contends that Mr. Hamer seeks remediation of all sidewalks, which the City

estimates would cost in excess of $10 million.  *See* [#82-6 at ¶ 6].  But the City has developed a Phase 1 and Phase 2 plan to deal with ADA deficiencies identified by Meeting the Challenge, some of which appear to overlap with the barriers Mr. Hamer alleges he has encountered throughout the last three years.  *See* Material Facts, *supra*, at ¶¶ 7, 11.  And while installing sidewalks in every location identified by Mr. Hamer might aggregately constitute an undue burden, the City has not established, nor even addressed, whether other reasonable modifications (particularly when viewed in their entirety) would be available to permit sufficient accessibility.[9]  *See Beckley v. City of Atlanta*, Georgia, No. 1:16-CV-1435-MHC, 2017 WL 6460300, at *4 (N.D. Ga. Oct. 18, 2017) (denying summary judgment on the defendant's undue burden defense because the defendant failed to establish that any reasonable alternatives were precluded).

Based on the foregoing, the court concludes the City has not established its undue burden defense as a matter of law.  *Culvahouse*, 679 F. Supp. 2d at 946 (holding that the defendant failed to carry its burden at summary judgment regarding its undue burden defense despite proffering evidence of its financial limitations).  Accordingly, I **DENY** the Renewed Motion for Summary Judgment in this regard.

### III.     Whether the Statute of Limitations Bars Mr. Hamer's Claims

Because neither Title II nor the RA provides a statute of limitations, "courts may infer that Congress intended the most analogous state statute of limitations to apply."  *E.E.O.C. v. W.H. Braum, Inc.*, 347 F.3d 1192, 1197 (10th Cir. 2003).  Here, Colorado's two-year statute of limitations applies to Mr. Hamer's ADA and RA claims.  *See Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1213 (D. Colo. 2010); *see also Hamer*, 924 F.3d at 1099 n.2 (assuming

---

[9] To this end, the Parties provide no indication whether the sidewalks at issue that remain noncompliant are located in high traffic areas, such as downtown Trinidad, and used by the City's residents at large, or whether the sidewalks at issue are unique to Mr. Hamer's personal use.  While not dispositive, such information may prove relevant to any undue burden defense asserted at trial.

Colorado's two-year statute of limitations applied). On appeal, the Tenth Circuit found that the appropriate legal test for determining whether Mr. Hamer's claims were timely is the repeated violations doctrine. *See id.* at 1103.

The repeated violations doctrine, the Tenth Circuit explained, "*divides* what might otherwise represent a single, time-barred cause of action into several separate claims, at least one of which accrues within the limitations period prior to suit." *Id.* at 1100 (emphasis in original). "That division, in turn, allows recovery for only that part of the injury the plaintiff suffered during the limitations period; recovery for the part of the injury suffered outside of the limitations period, however, remains unavailable." *Id.* (internal quotation marks omitted). In other words,

> each time a qualified individual with a disability encounters or "actually become[s] aware of" a non-compliant service, program, or activity "and is thereby deterred" from utilizing that service, program, or activity, he or she suffers discrimination and a cognizable injury. So long as the service, program, or activity remains non-compliant, "and so long as a plaintiff is aware of [that] and remains deterred," the qualified individual's injury repeats. A defendant, therefore, cannot brandish the statute of limitations in its usual manner as a shield that fully protects he, she, or it from suit. But the defendant can wield the statute of limitations as a sword that chops off damages arising before the limitations period comes into play.

*Id.* at 1107 (internal citations omitted). In remanding the case, the Tenth Circuit did not pass on the application of the repeated violations doctrine to Mr. Hamer's claims, but instead remanded that issue to this court to decide in the first instance. *Id.* at 1110. Thus, the court must determine which sidewalks Mr. Hamer was deterred from utilizing in the two years preceding suit as well as those since filing suit. *See id.* at 1103, 1110-11.

Once again, the City argues Mr. Hamer's claims are untimely. It maintains that Mr. Hamer has not come forth with any evidence establishing which sidewalks "he was unable to visit in the past three years," and instead relies on Mr. Heybeck's identification of "ADA violations *generally*." [#82 at 18-19 (emphasis in original)]. Mr. Hamer counters that he encounters barriers

daily, as his primary means of travel throughout the City are its sidewalks. *See* [#89 at 18-19]. He further argues that although he cannot identify the exact date(s) he encountered specific barriers, he encountered many of the barriers identified by Mr. Heybeck between October 12, 2014 and October 12, 2016 and since filing suit. *See* [*id.* at 19-20]. Indeed, Mr. Hamer attested to this in his Affidavit proffered in his Response to the Renewed Motion for Summary Judgment. *See* [#89-2 at ¶¶ 2-7]. These statements are consistent with Mr. Hamer's testimony from his April 27, 2017 deposition where he testified under oath that he had experienced difficulty with each and every sidewalk marked as noncompliant on Mr. Heybeck's report. [#92-2 at 237:7-12].

The Tenth Circuit's articulation of the repeated violations doctrine, at a minimum, refocused the court and the Parties to the salient factual issues related to the statute of limitations. Given Mr. Hamer's attestations, *see* [#89-2], and given that the court has concluded that his Affidavit is not merely a sham to create a genuine issue of material fact on the issue, *see supra*, at 7 n.4, a genuine issue of material fact exists as to whether Mr. Hamer's claims are timely. Accordingly, because the City fails to carry its burden to demonstrate the absence of a genuine dispute of material fact as to its affirmative defense, I **DENY** the Renewed Motion for Summary Judgment in this regard. In so ruling, this court does not conclude that Mr. Hamer's claims are all, in fact, timely but that Defendant has simply failed to sustain its burden of establishing that they are precluded as a matter of law.

## IV.    Remaining Matters

Given the court's conclusions above, this matter will proceed to a Final Pretrial Conference set for March 9, 2020, and ultimately to trial before the court. To prepare for trial, this court expects that Parties to be able to specifically articulate what sidewalks and/or curb cuts remain noncompliant with the ADA and RA that are at issue in this matter, as cabined by Mr. Heybeck's

supplemental expert report, the Meeting the Challenge Report, and Mr. Hamer's testimony. Indeed, neither Party provides the court with an updated listing and/or report of the sidewalks identified as noncompliant and whether the City has or plans to remediate those sidewalks. The only evidence in the record to that effect is Mr. Heybeck's initial expert report and Mr. Kibee's expert report, both of which are from 2017. *See* [#82-4; #82-7]. Though the Parties reference a survey completed by Meeting the Challenge in mid-2018 and a Phase 1 and Phase 2 development plan for remediating certain elements identied in the Meeting the Challenge survey, the record does not contain either document in its entirety. Nor does the City provide a complete copy of Mr. Heybeck's Supplement Inspection of the City's sidewalks that occurred on September 9, 2019, other than Mr. Heybeck's Supplement Expert Report, in support of its still pending Motion to Strike Mr. Heybeck's Supplement Expert Report. *See* [#109-1]. Accordingly, the Parties shall be prepared to present and/or discuss at the Final Pretrial Conference a means by which they will provide the court will all information relevant to the sidewalks that remain at issue in this matter, for example, by a table similar to the one below and a highlight sidewalk map similar to the one filed at [#41-13]:

| Location Description | Alleged deficiency | Proposed Alteration | Subject to Undue Burden Defense | Type of Traffic at Location |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)     The City's Renewed Motion for Summary Judgment [#82] is **DENIED**;

(2)     The City's Motion to Strike [#92] is **DENIED**;

(3)     Mr. Hamer's Motion to Supplement [#100] is **GRANTED**;

(4)     The City's Motion to Supplement [#102] is **GRANTED**; and

(5)     The Final Pretrial Conference **REMAINS SET** for March 9, 2020, with the Proposed Final Pretrial Order due **on or before March 2, 2020**.

DATED:  February 21, 2020                                    BY THE COURT:

                                                                    Nina Y. Wang
                                                                    United States Magistrate Judge